IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

LAUREN SACKMAN, individually
and as mother of Hannah Ross,
deceased, and as Administrator
of the Estate of Hannah Ross,

     Plaintiff,

        v.

BALFOUR BEATTY COMMUNITIES, LLC,
BALFOUR BEATTY MILITARY HOUSING
MANAGEMENT, LLC, JOHN DOE, JANE
DOE, RICHARD ROE CORPORATION,
and MARY DOE CORPORATION,

     Defendants.

                                  CV 113-066

## O R D E R

Presently pending before the Court is Balfour Beatty Communities, LLC and Balfour Beatty Military Housing Management, LLC's (collectively, "Balfour Beatty") motion for summary judgment (doc. no. 16), Balfour Beatty's motion to exclude expert testimony (doc. no. 18), and Lauren Sackman's motion for partial summary judgment (doc. no. 20). For the reasons stated below, Balfour Beatty's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**, Balfour Beatty's motion to exclude is **GRANTED**, and Plaintiff's motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**.

# I. BACKGROUND

## A. Factual Background

This case arises from the tragic drowning of an autistic child, Hannah Ross ("Hannah"). Lauren Sackman ("Plaintiff") and her ex-husband, Jeffrey Ross, are Hannah's surviving parents. At the time of her death, Hannah was seven years old. She lived with Plaintiff and Plaintiff's husband, John Sackman ("Mr. Sackman"), as well as her brother William Ross and half-brother Bradley Sackman (collectively, the "Sackmans"). Both Hannah and William were autistic. In 2011, the Sackmans were living in California. (J. Sackman Dep. at 6-7.) In February 2012, Mr. Sackman, a major in the United States Army, received notice that he was being transferred to Fort Gordon in Georgia.

### 1. Initial Communications with Balfour Beatty

Balfour Beatty provides property management services for military housing at Fort Gordon.[1] (Cohn Decl. ¶¶ 8-9.) On February 24, 2012, Plaintiff called Balfour Beatty in an effort to secure on-base housing and spoke with Carol Lawler, a receptionist. (L. Sackman Dep., Ex. 33.) Ms. Lawler then emailed Plaintiff a housing application, which Plaintiff completed and sent back to Ms. Lawler on February 29, 2012. (Id.) Plaintiff's application listed all relevant family members and indicated that at least one family member was enrolled in the Exceptional Family Member Program

---

[1] Plaintiff alleges theories of direct, agency, and joint venture liability between Balfour Beatty Communities, LLC and Balfour Beatty Military Housing Management, LLC. (Am. Compl. ¶ 17.) As these issues are not contested at this stage, the Court refers to both entities as "Balfour Beatty" for ease of reference.

2

("EFMP").[2]  (Id.)  The application also asked, "Do you require housing modifications?" and Plaintiff indicated that she did not.

(Id.)  However, in her email sending the completed application back to Ms. Lawler, Plaintiff stated:

> I went ahead and did say yes to having a family member in EFMP. My daughter from my first marriage was under EFMP before due to her having autism. . . . I didn't check yes to require housing modifications but would a fence be considered under that?  My daughter is considered a flight risk so we would for sure need one.

(Id.)  Ms. Lawler then forwarded the email correspondence to Nicole Campbell, the Senior Resident Specialist at Balfour Beatty.  (Id.) Ms. Campbell managed Balfour Beatty's waitlist for housing assignments and handled the Sackmans' application and housing assignment.  (Campbell Dep. at 8-9, 34-35, 39; Hignite Dep. at 29-30.)

On March 2, 2012, Ms. Campbell emailed Plaintiff and indicated that, after all necessary documents were received, Plaintiff might be placed in either the Maglin or Lakeview neighborhoods.  (L. Sackman Dep., Ex. 34.)  Ms. Campbell stated:

> The Lakeview floor plans do have fences in all the homes, however, Maglin is based on past resident [sic].  We do not put fences up in Maglin, but if your home does not have one, we will authorize you to put one up, but it would be at your own cost.  If the home does not have a fence, you can complete an Alterations Form and go with any vendor.  When you move out, you can choose to leave it or take it with you.

(Id.)  Thereafter, Plaintiff and Balfour Beatty exchanged additional emails and documents.  (L. Sackman Dep., Exs. 35-43.)

---

[2] EFMP is a program designed to help military families who have children with mental or physical disabilities.  (Washington Dep. at 12.)

## 2. *Housing Assignment and Move-In*

On March 15, 2012, Ms. Campbell notified the Sackmans that they were assigned a home in Fort Gordon's Lakeview neighborhood located at 135 Cypress Circle, Richmond County, Georgia.[3] (L. Sackman Dep., Ex. 44.) The home was situated near Soil Erosion Lake. (Campbell Dep. at 52.) However, the lake was not visible from the home due to a wooded area between the neighborhood and the lake. (Id.; Hignite Dep. at 102; Pl.'s Ex. 60.) Balfour Beatty did not factor the proximity of the lake and Hannah's flight risk into the decision to assign this home to the Sackmans. (Campbell Dep. at 52.) Balfour Beatty never informed the Sackmans about the lake. (Id.; J. Sackman Dep. at 12.) The Sackmans were unaware of the lake at the time they moved in. (J. Sackman Dep. at 11; L. Sackman Dep. at 177.)

On March 30, 2012, Plaintiff and Mr. Sackman met Ms. Campbell to tour the home, execute the requisite paperwork, and move in. (Campbell Dep. at 40, 46; L. Sackman Dep. at 133.) The three children were also present. (Campbell Dep. at 40.) Ms. Campbell was aware that two of the children were autistic and that Hannah was a flight risk. (Id. at 63-64.) Ms. Campbell walked through and around the house with the Sackmans, showing them all interior rooms and the curtilage. (Id. at 40.) Ms. Campbell knew about the

---

[3] The notification was sent to Plaintiff and Mr. Sackman via email and, among other information, provided a link to a "Resident Guide" on Balfour Beatty's website and requested that the Sackmans read the guide prior to their move-in appointment. (L. Sackman Dep., Ex. 44; Campbell Dep. at 46-47.)

lake but did not mention the lake.[4]  (Id. at 52; L. Sackman Dep. at 179.)

After touring the house, Mr. Sackman left to get a money order to pay for the first month of rent.  (L. Sackman Dep. at 133-34.) At that time, Ms. Campbell proceeded to show Plaintiff the backyard.  (Id. at 137-38.)  Plaintiff was concerned about the height of the fence surrounding the backyard.[5]  (Id. at 138.) Plaintiff asked Ms. Campbell if Plaintiff could make alterations to increase the height of the fence or build their own fence.  (Id. at 47, 138-41.)  Plaintiff also asked if the fence could be extended to enclose a side door that exited the garage.  (Id. at 141.)  Ms. Campbell responded that Plaintiff could not change the fence, as it was against policy.  (L. Sackman Dep. at 47, 140-41.)  At some point, Plaintiff also noticed a problem with the fence latch and said that it was unacceptable.  (Id. at 140; Campbell Dep. at 67.) Balfour Beatty fixed the latch on April 2, 2012.  (L. Sackman Dep. at 66-67, & Ex. 28.)

As Plaintiff believed that nothing could be done about the fence, she then asked if they could install additional locks on the doors that were higher up and out of Hannah's reach.  (L. Sackman Dep. at 42-43, 143.)  The house had three exterior doors and all of

_____

[4] Plaintiff testified that, if she had been notified of the lake at that time, she would not have accepted the house because she knew that Hannah was drawn to water.  (L. Sackman Dep. at 177-80.)  Mr. Sackman also testified that, if he had known about the lake, he would have requested a different housing assignment.  (J. Sackman Dep. at 52-53.)

[5] Plaintiff and Mr. Sackman had earlier observed the fence from inside the house through a window, and Plaintiff had expressed her concerns about the fence and the risk of Hannah escaping.  (J. Sackman Dep. at 8.)  Ms. Campbell was not present during that conversation. (Id.)

5

them had a locking mechanism on the knob and a dead-bolt – both of which could be unlocked from the inside with a simple twist and without using a key.[6] (Id. at 21-22, 135-37, & Ex. 20; J. Sackman Dep. at 19-20.) Although Hannah could not unlock the doors when they moved in, Plaintiff was concerned that she would figure out how to open them. (L. Sackman Dep. at 24, 143-44.) When Plaintiff asked to install additional locks, Ms. Campbell said, "no, it was against policy" and would damage the doors. (Id. at 43, 144.) Plaintiff "was told by Nicole Campbell that additional locks was [sic] not allowed," and "did not tell [Plaintiff] there was a form." (Id. at 44.) Ms. Campbell told Plaintiff that she would be given a citation for each lock installed.[7] (Id. at 144; J. Sackman Dep. at 22.) Mr. Sackman was not present during the exchanges about the fence and locks.[8] (Id. at 44, 144-45; J. Sackman Dep. at 9, 28.) Plaintiff told Mr. Sackman about the conversations after Ms. Campbell left. (L. Sackman Dep. at 147.)

In contrast, Ms. Campbell states that Plaintiff never asked for permission to change the fence or locks. (Campbell Dep. at 45-49.) According to Ms. Campbell, Plaintiff did make a comment about the fence not extending around the garage door, but "didn't say anything about Hannah" and never asked to change the fence. (Id.)

[6] Only one door, which led to the backyard, was enclosed by the fence. (L. Sackman Dep. at 107-08.)

[7] Mr. Sackman believed that the cumulative citations for locks on each door would have led to eviction, (J. Sackman Dep. at 22), but there is no testimony that Ms. Campbell actually threatened eviction.

[8] However, Mr. Sackman made a comment about a problem with the fence latch earlier during the tour. (Campbell Dep. at 44-45, 63.) Balfour Beatty fixed the latch on April 2, 2012. (L. Sackman Dep., Ex. 28.)

6

Further, there was "no discussion of locks" at all. (Id. at 48.)
Although there may be reasons to question Plaintiff's version of
events, the Court may not make any credibility determinations at
this juncture. For the purpose of Balfour Beatty's motion for
summary judgment, the Court must accept Plaintiff's version as
true.

At the end of the March 30 meeting, the Sackmans decided to
accept the house. (Id. at 43-44.) Ms. Campbell gave Mr. Sackman
the keys and signed the Resident Responsibility Agreement
(hereinafter, "Lease") and other documents on behalf of Balfour
Beatty and Fort Gordon Housing, LLC. (Id. at 42; L. Sackman Dep.,
Ex. 23). Mr. Sackman gave Ms. Campbell the money order and signed
the Lease and other documents.[9] (Campbell Dep. at 42-44; L. Sackman
Dep. at 133, & Ex. 23.)

Ms. Campbell indicated that an alteration request form was
included in the package of materials given to Mr. Sackman. (L.
Sackman Dep., Ex. 25.) Mr. Sackman did not read all the documents
he signed and received. (J. Sackman Dep. at 22-23, 35, 38-39.)
The process was "hurried" and he did not think that he or Ms.
Campbell had time for him to read every single document. (Id. at

---

[9] By signing the Lease, Mr. Sackman agreed *with Fort Gordon Housing LLC*,
inter alia, that: (1) he accepted all existing locks as safe and acceptable,
(2) he would provide written notice of requests to install or modify locks,
(3) he would not add locks or make other alterations to the premises without
receiving written consent of Fort Gordon Housing LLC, and (4) Fort Gordon
Housing LLC would not be liable to him or his family members for damages,
injuries, or losses caused by defects, disrepair, and other causes. (L.
Sackman Dep., Ex. 23 at 5, 7-8.) By signing other documents, Mr. Sackman
agreed *with Balfour Beatty*, inter alia, that (1) he accepted the house and
would not be permitted a transfer absent a change in rank, change in family
size, or with approval by Balfour Beatty, and (2) he was responsible for
reading Balfour Beaaty's online Resident Guide. (Id., Ex. 23 at 11-12.)

35.) Mr. Sackman did not get on Balfour Beatty's website to research procedures for requesting alterations, modifications, and accommodations. (Id. at 23-24.) Plaintiff stated she was unaware that she needed to submit a form to make changes to the fence or locks and never saw Balfour Beatty's alteration request form.[10] (L. Sackman Dep. at 44-47.) Ms. Campbell never mentioned the form to Plaintiff during the meeting on March 30, 2012. (Id. at 140-41.) Neither Plaintiff nor Mr. Sackman ever submitted a form or other written request for alterations, modifications, or accommodations relating to the locks or fence. (Id. at 48, 76; J. Sackman Dep. at 22-25.)

On April 3, 2012, Dana Wardell, a Balfour Beatty representative, called the Sackmans to check in and see how everything was going. (L. Sackman Dep. at 68-75, & Ex. 29.) Plaintiff does not remember much about the call, but Ms. Wardell indicated that Plaintiff said: (1) everything was going well, (2) there were service requests at move-in which had been completed, and (3) there was no hot water. (Id.) Mr. Sackman also submitted a property condition report and asked Balfour Beatty to fix minor problems with carpeting and a medicine cabinet. (Id., Exs. 26, 31.) Balfour Beatty never fixed the hot water, carpeting, and medicine cabinet problems. (Id. at 73-75.)

---

[10] However, Ms. Campbell's March 2, 2012 email indicated that Plaintiff should complete an "Alterations Form" if the assigned house did not have a fence and Plaintiff wanted to build one. (L. Sackman Dep. at 92-93, & Ex. 34.)

### 3. *Events Leading up to Hannah's Drowning*

In mid-April, about two weeks after moving in and two weeks before Hannah's death, Hannah climbed over the fence and headed downhill. (J. Sackman Dep. at 11-12; L. Sackman Dep. at 27-28.) Plaintiff noticed and informed Mr. Sackman who immediately ran down and caught her. At that time, both Hannah and Mr. Sackman saw the lake, and Plaintiff was also informed about the lake. (J. Sackman Dep. at 11-12; L. Sackman Dep. at 22-23, 27-28.) The Sackmans did not try to find a new home at that time because it was not financially feasible. (J. Sackman Dep. at 20.)

About two days before Hannah's death, Plaintiff and Mr. Sackman became aware that Hannah had figured out how to unlock the exterior doors. (J. Sackman Dep. at 21, 37; L. Sackman Dep. at 23-24.) They warned Hannah not to unlock the doors and planned to buy door alarms on Sunday.[11] (L. Sackman Dep. at 24-25, & Ex. 19; J. Sackman Dep. at 22.) They did not notify Balfour Beatty that Hannah had learned to unlock the doors or request modifications at that time. (L. Sackman Dep. at 24-25; J. Sackman Dep. at 37.)

On the evening of Saturday, April 28, 2012, Hannah eloped from the house while Plaintiff was having a conversation with Mr. Sackman and preparing dinner. (L. Sackman Dep. at 14-20, & Exs. 19, 21.) Plaintiff and Mr. Sackman noticed that she was missing and that the side door of the garage was open, which was not enclosed by the fence. (Id. at 20-22, & Exs. 19, 21.) Plaintiff,

---

[11] A door alarm is a magnetic device that causes an alarm to sound whenever the door opens. (J. Sackman Dep. at 22.)

Mr. Sackman, and eventually neighbors and military police proceeded to search the entire area for Hannah. (Id., Exs. 19, 21; Pl.'s Exs. 58-59.) Tragically, on April 29, 2012, Hannah was discovered in the lake, where she had drowned. (Hignite Dep. at 97, 106-07.) Thereafter, Balfour Beatty permitted and arranged for the Sackmans to move to a new home in the Maglin neighborhood. (Campbell Dep. at 68-69.)

## B. Procedural History

On March 22, 2013, Plaintiff filed suit in the Superior Court of Richmond County, Georgia. On May 1, 2013, Balfour Beatty removed the case to this Court. (Doc. no. 1.) On August 22, 2013, Plaintiff filed an Amended Complaint, which alleges federal claims under the Fair Housing Act and Rehabilitation Act and state law claims for negligence, fraud, and negligent misrepresentation. (Doc. no. 12.) Following discovery, Balfour Beatty moved for summary judgment on all of Plaintiff's claims (doc. no. 16) and moved to exclude Plaintiff's expert (doc. no. 18). Plaintiff filed a cross-motion for partial summary judgment on three of Balfour Beatty's defenses. (Doc. no. 20.) The motions are briefed and ripe for adjudication.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are

"material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere

conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave the parties notice of the motions for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other

materials in opposition, and the consequences of default. (Doc. nos. 17, 25.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

### III. BALFOUR BEATTY'S MOTION FOR SUMMARY JUDGMENT

#### A. Fair Housing Act Claims

##### 1. *Reasonable Modification*

Plaintiff alleges Balfour Beatty violated 42 U.S.C. § 3604(f)(3)(A), when its employee, Ms. Campbell, refused Plaintiff's request to modify the locks and fence at her own expense. Under the Fair Housing Act ("FHA"), unlawful discrimination includes:

> a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted.

42 U.S.C. § 3604(f)(3)(A).

To prevail on a section 3604(f)(3)(A) claim, a plaintiff must establish that (1) she is disabled or handicapped within the meaning of the FHA, (2) she requested a modification of the premises, (3) such modification was reasonable, (4) such modification was necessary to afford her full enjoyment of the premises, and (4) the defendants refused to permit the modification to be made at plaintiff's expense. Cf. Schwarz v. City of Treasure

13

*Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (elements of reasonable accommodation claim are refusal, reasonableness, and necessity); Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, 347 Fed. Appx. 464, 467 (11th Cir. 2009) (expanding on elements of reasonable accommodation claim); Weiss v. 2100 Condo. Ass'n, 941 F. Supp. 2d 1337, 1344-45 (S.D. Fla. 2013) (highlighting distinctions between reasonable modification and accommodation claims). Here, Balfour Beatty does not contest that Hannah was handicapped within the meaning of the FHA or that the modifications requested were reasonable and necessary. Rather, Balfour Beatty challenges the sufficiency of Plaintiff's request. (Doc. no. 16 at 11-13.)

Under the FHA, "a resident or an applicant for housing makes a reasonable modification request whenever she makes clear to the housing provider that she is requesting permission to make a structural change to the premises because of her disability." *Joint Statement of the Department of Housing and Urban Development and the Department of Justice on Reasonable Modifications under the Fair Housing Act*, at 9 (March 2, 2008) (hereinafter, "*Joint Statement*").[12] The FHA "does not require that a request be made in a particular manner or at a particular time. A person with a disability need not personally make the reasonable modification

---

[12] Policy statements made by federal agencies lack the force of law and do not warrant *Chevron*-style deference, but are entitled to respect if persuasive. Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000); see also Weiss, 941 F. Supp. 2d at 1345-46 (citing to the *Joint Statement* as persuasive authority); Solodar v. Old Port Cove Lake Point Tower Condo. Ass'n, Inc., No. 12-80040-CIV, 2012 WL 1570063, at *7 (S.D. Fla. May 2, 2012) (same); Bhogaita v. Altamonte Heights Condo. Ass'n, No. 13-12625, 2014 WL 4215853, at * 6 & n.3 (11th Cir. Aug. 27, 2014) (citing DOJ and HUD's Joint Statement on Reasonable Accommodations as persuasive).

request; the request can be made by a family member or someone else who is acting on her behalf."[13]   Id.

Importantly, the Eleventh Circuit has discussed the request requirement in the context of a reasonable accommodation claim.[14] See Schwarz v. City of Treasure Island, 544 F.3d 1201, 1219 (11th Cir. 2008).   In Schwarz, the Eleventh Circuit explained that "the duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made."   Id. (quotations omitted).   "Defendants must instead have been given an opportunity to make a final decision with respect to Plaintiffs' request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law."   Id.   "In other words, the [defendant] cannot be liable for refusing to grant a reasonable and necessary accommodation if the [defendant] never knew the accommodation was in fact necessary."   Id. (quotations omitted).   "[T]his means that the defendant must know *or reasonably be expected to know* of the existence of both the handicap and the necessity of the accommodation."   Hawn, 347 Fed. Appx. at 467 (emphasis added); accord United States v. Hialeah Hous. Auth., 418

---

[13] Balfour Beatty concedes "that no 'particular manner' is required for a request," but - in sharp contradiction - goes on to argue that Plaintiff's modification claim fails as a matter of law because of her failure to use Balfour Beatty's established, formal procedures for requesting modifications. (Doc. no. 34 at 4-5.)

[14] Although there are distinctions between reasonable modification and accommodation claims, the request requirement stems from the word "refusal," which is present in both subsections 3604(f)(3)(A) (modification) and (f)(3)(B) (accommodation).   Thus, the Court concludes that FHA cases discussing the sufficiency or a request for a reasonable accommodation are equally applicable in the reasonable modification context.

Fed. Appx. 872, 876 (11th Cir. 2011) ("[F]or a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [landlord] to make appropriate inquiries about the possible need for an accommodation."); *Joint Statement*, at 10 ("[T]he requester must make the request in a manner that a reasonable person would understand to be a request for permission to make a structural change because of a disability."). "Simply put, a plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA." Schwarz, 544 F.3d at 1219.

Here, there is a genuine dispute of fact as to whether a request for modification was made. (Compare Campbell Dep. at 45-49, with L. Sackman Dep. at 43-44, 47, 138-44.) On February 29, 2012, Plaintiff informed Balfour Beatty via email that her daughter was autistic and considered a flight risk. (L. Sackman Dep., Ex. 33.) Balfour Beaty's agent, Ms. Campbell, received that email. (Id.) At the March 30, 2012 meeting, Ms. Campbell knew that two of Plaintiff's children were autistic and that Hannah was a flight risk. (Campbell Dep. at 63-64.) As the children were exploring the fenced area, Plaintiff told Ms. Campbell, "this fence height is not going to be acceptable. My daughter is taller than the fence." (L. Sackman Dep. at 138-39.) Plaintiff "asked, can we change this,

can I -- we need to get this changed, and she said that's not our policy, that this was standard on all of the houses." (Id. at 140.) Plaintiff "asked, can I -- can we have our own fence, can we build our own fence, and she said no." (Id.) Plaintiff also "said that it didn't wrap around the side door, and I needed that to be wrapped around. . . . She said no, we could not change that. . . . She said it was against policy." (Id. at 141.)

Plaintiff then brought up the locks as soon as they went back inside. (Id. at 143.) Plaintiff "said, well, I need additional locks, then." (Id.) In a follow up question, defense counsel asked, "What did you tell her you needed?" (Id.) Plaintiff told Ms. Campbell, "I needed something higher up *so my daughter would not have access to it*." (Id. (emphasis added)) Ms. Campbell said, "no, that they could not provide additional locks because it would cause damage on the door." (Id. at 144.) Ms. Campbell "proceeded to tell [Plaintiff] for each lock would be a citation." (Id.)

Viewed in the light most favorable to Plaintiff, this evidence is sufficient to show that (1) Plaintiff requested a modification because of Hannah's disability, (2) Balfour Beatty was provided sufficient information to allow for meaningful review and determine if the requested modifications were reasonable and necessary in light of Hannah's disability, and (3) Balfour Beatty refused to permit the requested modification. See Schwarz, 544 F.3d at 1219; Hawn, 347 Fed. Appx. at 467; *Joint Statement*, at 9-10; cf. Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d 1154, 1172

(10th Cir. 1999) (plaintiff may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation" to convey a request for reasonable accommodation under the ADA).[15]

Balfour Beatty argues that it was given no evidence of necessity.[16] Yet, Plaintiff informed Balfour Beatty, via email, that Hannah was autistic and a flight risk, and Ms. Campbell was aware of these facts at the time Plaintiff asked for modifications to the fence and locks. Plaintiff mentioned Hannah in discussing the need for a higher fence and expressly told Ms. Campbell that she "needed" locks that were higher up "so that [Hannah] would not have access" to them. There is at least a question of fact as to whether Balfour Beatty knew or could reasonably be expected to have known of the existence of the handicap and the necessity of the modification. See Hawn, 347 Fed. Appx. at 467; see also Hialeah Hous. Auth., 418 Fed. Appx. at 876-77 (sufficiency of request for reasonable accommodation under the FHA is generally a jury question).

Balfour Beatty also tries to shift focus from the sufficiency of the requests that were actually made by Plaintiff to additional actions which Plaintiff could have taken to repeat her requests or formally submit them in writing.[17] (Doc. no. 16 at 12-13; Doc. no.

---

[15] As the ADA and FHA share certain concepts, the Court may look to ADA caselaw for guidance. Schwarz, 544 F.3d at 1220.

[16] The Court notes that Balfour Beatty has not argued that Plaintiff was required to offer to pay for the modifications as part of her request or that Plaintiff failed to do so. As this issue was not briefed, the Court will not address it.

[17] The appropriate focus is on the sufficiency of the requests that were actually made and whether they gave Balfour Beatty an opportunity to conduct

34 at 4-5.) For example, Balfour Beatty, selectively quoting a portion of a footnote in Schwarz, argues that Plaintiff was required - as a matter of law - to submit Balfour Beatty's alteration request form (as provided in the move-in packet) or modification and accommodation request form (as provided online and at its Fort Gordon office). According to Balfour Beatty, "failure to use the formal, existing system for requesting a modification defeats any claim that Balfour Beatty 'refused' to make a requested modification." (Doc. no. 34 at 5.) The Court disagrees.

First, the statutory text does not contain any requirement that the request be made in writing; nor does it include other formal requirements or procedural exhaustion requirements. See § 3604(f)(3)(A); see also *Joint Statement* at 10 (Although it is advisable to make modification requests in writing to prevent misunderstandings, "housing providers must give appropriate consideration to reasonable modification requests *even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.*" (emphasis added)); cf. Hialeah Hous. Auth., 418 Fed. Appx. at 876 ("[W]hat matters under the ADA are not formalisms about the manner of the request, but whether the [plaintiff] provides the employer with enough information that, under the circumstances, the employer can

---

a meaningful review. The fact that Balfour Beatty refused Plaintiff's request without actually conducting a meaningful review or asking for additional information (according to Plaintiff's testimony) is irrelevant to the sufficiency of the request made.

19

be fairly said to know of both the disability and desire for an accommodation." (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)).

Second, the Schwarz footnote does not control this case. The Eleventh Circuit noted that "[s]everal courts have held that if there is a local procedure (such as a variance process) through which the plaintiffs can obtain the accommodations they want, they must use that procedure first and come away unsatisfied prior to filing suit in federal court." Schwarz, 544 F.3d at 1219 n.11 (citing Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 578 (2d Cir. 2003); Oxford House-C v. City of St. Louis, 77 F.3d 249, 253 (8th Cir. 1996); United States v. Vill. of Palatine, Ill., 37 F.3d 1230, 1233 (7th Cir. 1994)). Each of the cited cases, like Schwarz, involved reasonable accommodation claims against municipalities based on zoning restrictions. The cited cases generally held that, in the zoning context, an FHA plaintiff must actually apply for a variance or special use permit and be denied for there to be a "refusal" to accommodate. The present case does not involve a request for accommodation based on zoning restrictions. The Court is reluctant to extend those cases and engraft a requirement that all housing residents or applicants must use the forms provided by the housing provider to request a reasonable modification, especially when considering that the FHA itself imposes no such requirement. Moreover, in an exercise of restraint, the Eleventh Circuit declined to adopt the reasoning set

forth in the cases it cited. Id. ("But here the City does not argue that there were any local procedures available to [the plaintiff], and, therefore, we have no occasion to address the matter.").

In addition, Balfour Beatty complains, at least initially, that the request was made to a "low-level employee" without authority to make a decision on the modification. (Doc. no. 16 at 12-13.) Balfour Beatty clarifies in its reply brief that "Ms. Campbell's lack of authority is a defense under the Rehabilitation Act, not a defense under the [FHA]."[18] (Doc. no. 34 at 3.)

In sum, the Court concludes that there are genuine, material factual disputes as to the sufficiency of Plaintiff's requests. The Court rejects Balfour Beatty's arguments that a more formal request was required as a matter of law. The reasonable modification claim will proceed to trial.

### 2. Reasonable Accommodation

Plaintiff also alleges that Balfour Beatty violated the FHA by refusing to make reasonable accommodations. Under the FHA, handicap discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). "To prevail on a section 3604(f)(3)(B) claim, a

---

[18] The Court notes that Ms. Campbell had authority to sign the Lease and other documents on the behalf of Balfour Beatty and Fort Gordon Housing, LLC. (See L. Sackman Dep., Ex. 23.)

plaintiff must establish that (1) [she] is disabled or handicapped within the meaning of the FHA, (2) [she] requested a reasonable accommodation, (3) such accommodation was necessary to afford [her] an opportunity to use and enjoy [her] dwelling, and (4) the defendants refused to make the requested accommodation." Hawn, 347 Fed. Appx. at 467. Balfour Beatty argues that Plaintiff did not request a reasonable accommodation. On this claim, the Court agrees.

Plaintiff predicates her reasonable accommodation claim on her requests to alter the the fencing and locks. (Doc. no. 29 at 11.) Those requests, however, were for modifications, not accomodations. The plain language of § 3604(f)(3)(B) refers to accommodations in "rules, policies, practices, or services." In contrast, § 3604(f)(3)(A) refers to modifications "of existing premises." Reading these provisions in conjunction, courts have repeatedly found that requests for construction, repair or renovation are more appropriately classified as requests for modification than an accommodation. E.g., Weiss, 941 F. Supp. 2d at 1344 (citing Reyes v. Fairfield Props., 661 F. Supp. 2d 249, 258-61 (E.D.N.Y. 2009); Fagundes v. Charter Builders, Inc., C07-1111, 2008 WL 268977, at *6 (N.D. Cal. Jan. 29, 2008); Thompson v. Westboro Condo. Ass'n, No. 05-1893, 2006 WL 2473464, at *4 (W.D. Wash. Aug. 25, 2006); Rodriguez v. 551 W. 157th St. Owners Corp., 992 F. Supp. 385 (S.D.N.Y. 1998)); see also Joint Statement, at 6 ("Under the [FHA], a reasonable modification is a structural change made to the

premises whereas a reasonable accommodation is a change, exception, or adjustment to a rule, policy, practice, or service.").

Here, Plaintiff requested to increase the height of the fence, extend the fence, build her own fence, and install additional locks onto the doors. These are requests to modify the premises, not to accommodate any rule, policy, practice, or service of Balfour Beatty. Further, Plaintiff has not presented evidence of any other request which could be classified as a request for accommodation. Thus, Balfour Beatty is entitled to summary judgment on Plaintiff's reasonable accommodation claim.

### 3. Intentional Interference

Plaintiff also alleges that Balfour Beatty violated 42 U.S.C. § 3617, which states:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617. To prevail on a § 3617 claim, the plaintiff must show that (1) she is a member of a protected class under the FHA, (2) she was engaged in the exercise or enjoyment of a right protected by the FHA or aided or encouraged another person to exercise such rights, (3) the defendant coerced, threatened, intimidated, or interfered with the plaintiff's exercise of her FHA rights, and (4) defendant was motivated in part by an intent to discriminate. E.-Miller v. Lake Cnty. Highway Dep't, 421 F.3d 558,

563 (7th Cir. 2005); <u>Baggett v. Baird</u>, No. 4:94-cv-282, 1997 WL 151544, at *37 (N.D. Ga. Feb. 18, 1997); <u>see also</u> <u>Sofarelli v. Pinellas Cnty.</u>, 931 F.2d 718, 722 (11th Cir. 1991) (to prevail under § 3617, a plaintiff must establish that discriminatory intent "played some role" in the defendant's actions).

The first two elements are undisputed. Hannah, due to her autism, is considered handicapped under the FHA, and Plaintiff exercised a right protected by § 3604 (or aided Hannah in doing so) by requesting a reasonable modification of the fences and locks. Balfour Beatty, however, argues that there is no evidence of interference or intentional discrimination. The Court disagrees.

According to Plaintiff's testimony, Ms. Campbell denied Plaintiff's request to modify the fence and locks and threatened to issue a citation for each lock that the Sackmans installed. This conduct may constitute a threat or interference within the meaning of the statute. Section 3617 "does not require a showing of force or violence for coercion, interference, intimidation, or threats to give rise to liability." <u>See</u> <u>Nevels v. W. World Ins. Co.</u>, 359 F. Supp. 2d 1110, 1122 (W.D. Wash. 2004) (threatening to cancel liability insurance constituted interference with ability to provide housing to mentally disabled persons); <u>see also</u> <u>King v. Metcalf 56 Homes Ass'n</u>, 385 F. Supp. 2d 1137, 1143 (D. Kan. 2005) (reviewing Sixth, Seventh, and Ninth Circuit opinions and determining that "interference" under § 3617 reaches a broad range

of conduct and does not require egregious acts such as firebombing, cross burning, or physical assault).

In order to prove the fourth element, intentional discrimination, Plaintiff "may establish that [Balfour Beatty] had a discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test." E.- Miller, 421 F.3d at 563. As discussed in relation to the reasonable modification claim, it can be inferred that Ms. Campbell was aware that Plaintiff's requests to modify the fence and locks were directly related to Hannah's autism and flight risk. Further, Ms. Campbell was aware that tenants with disabilities have the right to reasonable modifications under the FHA. (Campbell Dep. at 16-18.) And according to Plaintiff's testimony, Ms. Campbell denied Plaintiff's request to modify the fence and locks and threatened to issue a citation for each lock the Sackmans installed. This is sufficient evidence for a rational trier of fact to infer discrimination, and Balfour Beatty does not provide a legitimate, nondiscriminatory reason for Ms. Campbell's denial and threat to issue citations. See Potomac Grp. Home Corp. v. Montgomery Cnty., Md., 823 F. Supp. 1285, 1294, 1301 (D. Md. 1993) (whether defendants conducted a surprise inspection, sent a deficiency letter, and held a hearing in violation of § 3617 "requires a determination of the subjective intent of the defendants in engaging in the challenged actions," and "will in

large part be based upon the credibility of the witnesses at trial, and cannot be resolved by way of defendants' motion for summary judgment"); Byrd v. Brandeburg, 922 F. Supp. 60, 64 (N.D. Ohio 1996) (discrimination inferred under § 3617 where defendants failed to articulate a nondiscriminatory reason for the actions taken).

Balfour Beatty argues that Plaintiff has admitted that Ms. Campbell had no intent to discriminate. (Doc. nos. 16 at 11; 34 at 3.) However, the cited page of Plaintiff's deposition reveals only that Plaintiff believed Ms. Campbell forgot to tell Plaintiff about the alteration request form because Ms. Campbell was "overwhelmed" by the children and "wanted to get out of there." (L. Sackman Dep. at 142.) The Court makes a few observations. First, the fact that Ms. Campbell was "overwhelmed" by two autistic children and "wanted to get out of there" is not necessarily inconsistent with discriminatory animus. Ms. Campbell was also "irritated" with Plaintiff for making the request. (Id. at 145.) Second, the fact that Ms. Campbell may have forgotten to tell Plaintiff about the available forms does not somehow negate Plaintiff's testimony that Ms. Campbell denied the reasonable modification requests and threatened to cite Plaintiff for lock modifications needed to mitigate Hannah's flight risk. Ms. Campbell's purportedly *passive* lapse in memory regarding the forms is not a legitimate, nondiscriminatory reason for *actively* denying the modifications and threatening to cite the Sackmans. Further, Ms. Campbell's actual position is that she never even spoke with Plaintiff about the

26

fence and locks and never actually denied any request for modification or threatened citation. Plaintiff testified otherwise. This is the central dispute of fact in this case. If a jury were to resolve that conflict of testimony against Ms. Campbell, it might likewise conclude that Ms. Campbell acted with discriminatory animus.

In sum, there are genuine disputes of material fact that preclude resolution of Plaintiff's § 3617 claim on summary judgment.

### B. Rehabilitation Act Claim

To support her claim under the Rehabilitation Act, Plaintiff must establish that Balfour Beatty receives "federal financial assistance." The relevant provision states:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity *receiving Federal financial assistance* or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a) (emphasis added). As the receipt of federal financial assistance has "jurisdictional implications," it must be considered prior to delving into the merits of the claim. Arline v. Sch. Bd. of Nassau Cnty., 772 F.2d 759, 762 (11th Cir. 1985), aff'd 480 U.S. 273 (1987).

The statute "applies to programs receiving federal financial aid *of any kind*." Id. (emphasis in original) (citation omitted). However, "when the federal government makes payments for

obligations incurred as a market participant such payments do not constitute 'federal assistance.'" Id. "[T]he term 'financial assistance' contemplates grants, loans or subsidies without reciprocal services or benefits." Leskinen v. Utz Quality Foods, Inc., 30 F. Supp. 2d 530, 534 (D. Md. 1998), aff'd 165 F.3d 911 (4th Cir. 1998). Merely entering into a procurement contract with the federal government does not constitute receipt of federal financial assistance. Jones v. Ala. Power Co., No. CV-94-PT-0094-S, 1995 WL 238338, at *19 (N.D. Ala. Jan. 3, 1995), aff'd 77 F.3d 498 (11th Cir. 1996); see also Squire v. United Airlines, Inc., 973 F. Supp. 1004, 1008 (D. Colo. 1997) ("Simply engaging in a contract for services with the government does not entail receipt of federal funds" for Rehabilitation Act purposes.). Indeed, the applicable federal regulations specifically exclude procurement contracts from the definition of federal financial assistance. See 32 C.F.R. § 56.3(b). Further, the regulations state that contracts or other arrangements by which the federal government makes available real property through a lease constitute federal financial assistance only if the lease is "for less than fair market value or for reduced consideration." Id. § 56.3(b)(3)(i).

Here, the record shows that (1) Fort Gordon Housing, LLC (a non-party) owns and operates the subject housing at Fort Gordon, possibly under a fifty-year lease with the Department of the Army; (2) the Department of the Army holds a 90% interest in Fort Gordon Housing, LLC and Balfour Beatty Communities, LLC holds a 10%

interest; (3) the Department of the Army made an initial equity contribution in forming Fort Gordon Housing, LLC; (4) Fort Gordon Housing, LLC receives income through rents paid by tenants, which includes the Basic Allowance of Housing that the servicemen receive; (5) Fort Gordon Housing, LLC put out a bid and contracted with Balfour Beatty Military Housing Management, LLC to provide property management services at Fort Gordon; (6) Balfour Beatty Military Housing Management, LLC receives property management fees from Fort Gordon Housing, LLC; (7) Balfour Beatty Communities, LLC provides property management services at Fort Gordon; (8) as the parent of Balfour Beatty Military Housing Management, LLC, Balfour Beatty Communities, LLC ultimately receives the property management fee income from Balfour Beatty Military Housing Management, LLC; and (9) Balfour Beatty Communities, LLC also receives 10% of the net income of Fort Gordon Housing, LLC. (See Cohn Decl. ¶¶ 5-9; Hignite Dep. at 20-21, 32-33.)

Plaintiff has not provided sufficient facts to show that Balfour Beatty receives federal financial assistance within the meaning of the Rehabilitation Act. Rather, the record evidence indicates that Balfour Beatty provides property management services to the federal government and receives fees for those services through a procurement contract. In this context, the federal government is paying for obligations incurred as a market participant, not providing financial assistance. Further, to the extent that Fort Gordon Housing, LLC has executed a lease with the

29

federal government at Fort Gordon, Plaintiff has not shown that the property is being leased at less than fair market value. Nor has Plaintiff demonstrated that Balfour Beatty Communities, LLC acquired its 10% interest in Fort Gordon Housing, LLC in a manner that would constitute receipt of federal financial assistance.

In sum, there is no evidence that Balfour Beatty receives federal financial assistance. Therefore, Balfour Beatty is entitled to summary judgment on Plaintiff's Rehabilitation Act claim.

### C. Negligence

Plaintiff advances various negligence theories. (See Am. Compl. ¶ 52-53.) "To state a cause of action for negligence in Georgia, the following elements are essential: (1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." Bradley Ctr., Inc. v. Wessner, 250 Ga. 199, 200, 296 (1982) (quotation omitted). Balfour Beatty argues that Plaintiff has not established a legal duty or breach and that the claim fails because the lake was an open and obvious hazard. (Doc. nos. 16 at 18-19; 34 at 9-10.)

As to duty and standard of care, Plaintiff cites: (1) the general duty to exercise reasonable care as an ordinarily prudent person (O.C.G.A. § 51-1-2), (2) the duty of care applicable to owners and occupiers of land (O.C.G.A. § 51-3-1), and (3) the duty of care applicable to landlords (O.C.G.A. § 44-7-14). Further, Plaintiff attempts to establish the applicable standard of care through her expert's opinions and through public representations Balfour Beatty made regarding safety. (Doc. no. 29 at 17-19, & Ex. 1 at 24-26.)

Balfour Beatty was required to comply with the landlord standard of care. Where a property manager undertakes complete control over the premises, the property manager is subject to the same duties as a landlord. See O'Connell v. Cora Bett Thomas Realty, Inc., 254 Ga. App. 311, 313 (2002); Total Equity Mgmt. Corp. v. Demps, 191 Ga. App. 21, 22 (1989). Here, Plaintiff signed a rental agreement with Fort Gordon Housing, LLC. Balfour Beatty managed the property, and there is evidence showing that Balfour Beatty assumed complete control and responsibility for management of the Sackmans' house.[19] (See Hignite Dep. at 32-37; Cohn Decl. ¶¶ 8-9.) Thus, the Court concludes that the applicable standard of care is that of a landlord.[20]

---

[19] Balfour Beatty has not argued otherwise.

[20] As set forth infra, the Court excludes the testimony of Plaintiff's expert as unreliable and unhelpful for the trier of fact. Consequently, Plaintiff may not rely on the expert's opinions to establish the standard of care. Also, Plaintiff has not provided any authority showing that a standard of care may be created through public representations.

Further, the Court rejects the other standards of care cited by Plaintiff (general standard and landowner standard) because the landlord-

A landlord "is not an insurer of his tenant's safety," but "he certainly is not a bystander." Demarest, 201 Ga. App. at 92. The landlord "must keep the premises in repair" and "is responsible for damages . . . arising from the failure to keep the premises in repair." O.C.G.A. §§ 44-7-13, -14. If the rental property is a "dwelling place," the landlord may not avoid (and the tenant may not waive) the landlord's duty to repair or the resulting liability. O.C.G.A. § 44-7-2(b)(1)-(2). Although "a landlord is liable for damages resulting from its failure to keep rented premises in repair," the landlord's "liability only attaches upon a showing of notice." Haynes v. Kingstown Props., Inc., 260 Ga. App. 102, 103 (2003). In regards to notice, "[t]he required knowledge can be actual or constructive." Id.; see also Warner v. Arnold, 133 Ga. App. 174, 178-79 (1974) (Duty to repair applies if landlord "knows, or in the exercise of ordinary care ought to know, of a

---

tenant standard is directly applicable to this case. Under O.C.G.A. § 51-3-1, a landlord has a duty to exercise ordinary care to avoid injury to invitees and tenants, but this duty to "keep safe portions of the leased premises designated as common areas in which the landlord has reserved a qualified right of possession, does not extend to the leased areas of the premises over which the tenant has exclusive possession and control." Gale v. N. Meadow Assocs. Joint Venture, 219 Ga. App. 801, 802-03 (1995). Here, there were no "common areas" on the premises. The entire home - including the allegedly defective locks and fence - was leased to the Sackmans. And the lake was not owned by Balfour Beatty. Consequently, only the landlord standard of care (O.C.G.A. § 44-7-14) applies. See Plott v. Cloer, 219 Ga. App. 130, 131 (1995) ("[W]here, as here, the owner has *fully parted with possession by rental or lease* his liabilities are measured by (O.C.G.A. § 44-7-14), (O.C.G.A. § 51-3-1) having no application."); Demarest v. Moore, 201 Ga. App. 90, 92 (1991) (applying § 44-7-14 to landlord who allegedly failed to provide sufficient locks). Thus, the Court focuses on the landlord's limited duty to repair under § 44-7-14 and Plaintiff's claim that Balfour Beatty was negligent by rental by failing to make or allow reasonable repairs. (See Am. Compl. ¶¶ 52 (g)-(h)). The Court summarily rejects Plaintiff's negligence theories that do not rely on, and are inconsistent with, the landlord standard of care, such as Plaintiff's theory that Balfour Beatty negligently failed to warn the Sackmans about the lake.

32

possibly dangerous situation."). "Accordingly, if the landlord receives notice that the premises are not in repair, it has a duty to inspect and investigate in order to make such repairs as the safety of the tenant requires." Haynes, 260 Ga. App. at 103 (quotations omitted). "[The landlord] therefore, is liable to [the tenant] for damages caused by its failure to exercise reasonable care in repairing a *known* dangerous condition." Id. (emphasis in original); see also Warner, 133 Ga. App. at 178-79 (questions of whether landlord had notice, exercised reasonable care, and caused plaintiff's injury depend on the totality of the circumstances and are generally questions of fact).

Here, there is a question of fact as to whether Balfour Beatty had adequate notice of a need to repair the locks or fence. Balfour Beatty and Ms. Campbell were aware of Hannah's autism, flight risk, and the proximity of the lake. Although disputed by Ms. Campbell, Plaintiff testified that she told Ms. Campbell that they needed to increase the height of the fence due to Hannah, extend the fence to enclose the garage door, and install additional locks that were out of Hannah's reach.[21] Cf. Walker v. Sturbridge Partners, Ltd., 221 Ga. App. 36, 36-37, 40 (1996) (jury question remained as to adequacy of notice given to landlord where tenant claimed to have verbally requested that landlord fix her window locks, landlord did not repair the locks, and intruder broke in

---

[21] In addition, there is evidence that Balfour Beatty had knowledge of prior instances in which special needs children eloped from Balfour Beatty homes at Fort Gordon. (Pl.'s Ex. 16; Washington Dep. at 129-31; Hignite Dep. at 198-213; Woodard Dep. at 31-38; Campbell Dep. at 55-56.)

through window and raped tenant), <u>aff'd,</u> 267 Ga. 785 (1997); <u>Demarest</u>, 201 Ga. App. at 90-92 (reversing landlord's summary judgment where tenant never asked landlord to repair his lock or for permission to repair it; but the landlord's apartment manager attended a meeting where police indicated that dead-bolt locks were insufficient to prevent break-ins unless the hardware was secured to the doorframe by 3 ½-inch screws; only ½-inch screws anchored the dead-bolts; a burglar entered the apartment by knocking dead-bolt off the doorframe; tenant's personal property was stolen; and landlord had a reasonable time between the meeting and burglary to repair the lock); <u>Warner</u>, 133 Ga. App. at 174-5, 178-79 (affirming denial of summary judgment where tenant orally requested that property manager install additional door lock, property manager took no action, and burglar subsequently broke in and set a fire).

Further, there is a question of fact as to whether the fence and locks were a "dangerous condition" that a reasonable landlord would have repaired. <u>Haynes</u>, 260 Ga. App. at 103; <u>cf.</u> <u>Warner</u>, 133 Ga. App. at 178 ("In the case before us, it is contended that the lock to the plaintiffs' apartment was a functioning lock and that the plaintiffs accepted the apartment 'as is.' Though the lock may be said to be 'functioning,' it does not follow that the lock was 'functional,' that is, capable of adequately performing or serving the function to which it was put. There exists today a variety of locks, each designed to provide a different measure of security according to the needs of the individual and his property.");

Walker, 221 Ga. App. at 40 (concluding that jury question remained as to whether lock was adequate and rejecting landlord's argument that it was entitled to summary judgment because lock functioned as designed and used). "Georgia case law has recognized that suitability is important in determining whether a duty to repair exists for which liability may be imposed." Warner, 133 Ga. App. at 179. Here, Balfour Beatty was aware of Hannah's autism, flight risk, and proximity of the lake. Further, Plaintiff claims that she told Ms. Campbell that the fence and door locks needed to be modified because of Hannah. Under these circumstances, whether the fence and locks were suitable or a dangerous condition subject to the duty of repair is a jury question.

The record shows that Balfour Beatty did not take any action to repair the fence or locks, or to authorize Plaintiff to do so. Further, the evidence indicates that Hannah eloped through the exterior side door of the garage. The door could be opened from the inside by simply twisting the two locking mechanisms within Hannah's reach, and it opened to an area of the yard that was not enclosed by the fence. Hannah then eloped to the lake and drowned. Questions of fact remain regarding breach, causation, and damages. "The immediacy of the connection between the inadequate (although functioning) lock, the landlord's notice of the inadequacy, either actual or constructive, and [Hannah's elopement and death], compels [the Court] to hold that [Balfour Beatty] is not insulated as a matter of law, and that the jury should properly pass on the

questions of agency, notice, foreseeability, intervening causation, assumption of risk, as well as the suitability of the lock [and fence] in question." See Warner, 133 Ga. App. at 179.

Balfour Beatty also argues that Plaintiff cannot recover as a matter of law because the lake was an open and obvious hazard, even to a young autistic child. (Doc. no. 16 at 18-19 (citing Brazier v. Phoenix Grp. Mgmt., 280 Ga. App. 67 (2006)). In Brazier, the court stated that: "Breach of duty alone does not make a defendant liable in negligence. The rule remains that the true ground of liability is the *superior* knowledge of the property owner or occupier of the existence of a condition that may subject the invitee to an unreasonable risk of harm." 280 Ga. App. at 70-71. The court determined that the plaintiff's negligence claim failed because a thirteen-year-old autistic boy and his mother (who drowned attempting to save him) appreciated the risk of a lake, an open and obvious hazard. Id. at 71-72. Brazier, however, is inapposite for two important reasons.

First, in Brazier, there was "no evidence" that the thirteen-year-old autistic boy was so "mentally impaired that he could not follow directions or recognize hazards," such as a lake. Id. at 72. In fact, the boy had taken swimming lessons and was familiar with large bodies of water. Id. In this case, however, there is evidence that seven-year-old Hannah (1) was a flight risk, (2) had the communication skills of a two-year-old or younger child, (3) was unable to perform tasks that would normally be associated with

a child of her age, (4) was instinctively drawn to water in a manner perceived by Plaintiff as dangerous, (5) thought the lake was a swimming pool, (6) "thought everything with water was a swimming pool," and (7) drowned in the lake. (J. Sackman Dep. at 7; L. Sackman Dep. at 22-23, 28, 177-78.) Considering these facts, there is a jury question as to whether Hannah was able to appreciate the risk associated with the lake.

Second, *Brazier* was not a landlord-tenant case. In the landlord-tenant context, the superior knowledge rule is not strictly applied as in *landowner* cases.

> Although plaintiff's knowledge of the dangerous condition was at least equal to that of defendant, this will always be the case when a tenant has repeatedly complained about a dangerous condition and a landlord has failed to fix it. Thus, [the Georgia] Supreme Court has recognized that strict application of the superior knowledge rule in the landlord-tenant context would be inconsistent with the legislature's determination that, as a matter of public policy, landlords have a duty to repair problematic conditions in leased premises. See Thompson v. Crownover, 259 Ga. 126, 381 S.E.2d 283 (1989); O.C.G.A. § 44-7-13. . . . As the result of its recognition of this policy and its importance, the Supreme Court in Thompson held that a plaintiff/tenant's equal or superior knowledge of a dangerous condition will not always preclude his or her recovery for injuries caused by that dangerous condition. 259 Ga. at 129-130, 381 S.E.2d 283. See also Grier v. Jeffco Mgmt. Co., 176 Ga. App. 158, 159, 335 S.E.2d 408 (1985) ("Whatever force the doctrines of superior knowledge and assumption of risk may have in cases involving the liability of property owners to business customers, they have certainly been relaxed in recent years in the landlord-tenant setting.").
>
> A review of post-Thompson cases shows that the knowledge of the parties has certainly not become irrelevant. The tenant still must show that the landlord had notice of the problem. See Harris v. Sloan, 199 Ga. App. 340(1), 405 S.E.2d 68 (1991). Where both tenant and landlord were aware of the problem, however, the question has become: Given the tenant's equal or superior

knowledge, could he or she have avoided the accident, either by avoiding the problematic area, or by using it more cautiously?

Phillips v. King, 214 Ga. App. 712, 713 (1994). Thus, in this case, Plaintiff and Hannah's equal or superior knowledge of the risk associated with the lake is not dispositive. Whether Plaintiff or Hannah could have avoided Hannah's drowning despite the inadequacies of the locks and fence is not susceptible to summary adjudication.[22] Thompson, 259 Ga. at 129-30. Without modifying the locks or fence, Plaintiff's ability to prevent Hannah from eloping through the exterior doors was significantly limited. And whether Plaintiff and Mr. Sackman were exercising ordinary care in supervising Hannah on the night of the drowning is certainly a jury question.

In sum, the Court concludes that there are genuine, material factual disputes that preclude summary judgment on Plaintiff's negligence claim.

**D. Fraud**

In Georgia, fraud has five elements: (1) a false representation by defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff. Crawford v. Williams, 258 Ga. 806, 806 (1989). Plaintiff alleges that Ms. Campbell, on behalf of Balfour Beatty, committed fraud by telling Plaintiff that the requested modifications to the fence and locks

---

[22] Moreover, Balfour Beatty has not presented any argument under the landlord standard, as set forth in Phillips.

were not permitted and would subject the Sackmans to citations. Assuming without deciding that this was a false representation made with scienter and intent to induce plaintiff to refrain from making the modifications, Plaintiff cannot show justifiable reliance. Plaintiff and Mr. Sackman testified that they believed Ms. Campbell (L. Sackman Dep. at 47, 144; J. Sackman Dep. at 24, 27-28), but Plaintiff has not explained why this reliance was justifiable.[23]

In order to prove justifiable reliance, a party must show that she exercised due diligence. Martin v. Ctr. Pointe Investments, Inc., 310 Ga. App. 253, 257 (2011). Generally, a plaintiff has a duty to exercise due diligence and "cannot be permitted to claim that he has been deceived by false representations about which he could have learned the truth of the matter." Fowler v. Overby, 223 Ga. App. 803, 803-04 (1996). "The law does not afford relief to one who suffers by not using the ordinary means of information, whether the neglect is due to indifference or credulity." Real Estate Int'l, Inc. v. Buggay, 220 Ga. App. 449, 451 (1996). "While questions of due diligence often must be resolved by the trier of fact, that is not always the case. One may fail to exercise due diligence as a matter of law." Fowler, 223 Ga. App. at 804.

Plaintiff took no action to determine the veracity of Ms. Campbell's statement that the requested modifications were against policy and not permitted – even though slight diligence would have

---

[23] Although Balfour Beatty directly addresses this issue in its motion (doc. no 16 at 20-21), Plaintiff's response brief makes no attempt to explain why Plaintiff's reliance was reasonable or justified (doc. no. 29 at 15-16).

revealed otherwise. Plaintiff should have been aware, from Ms. Campbell's March 2, 2012 email, that there was a process for requesting alterations to the house. Ms. Campbell told Plaintiff that, if the assigned home did not have a fence, "we will authorize you to put one up," and directed her to "complete an Alterations Form." (L. Sackman Dep., Ex. 34.) Further, an alterations request form was included in the packet of materials given to the Sackmans when they moved in on March 30, 2012. (Id., Ex. 25.) Additionally, the Lease indicated that there was a process for seeking modifications of the house. The Lease stated that, upon written request by the tenant, Balfour Beatty would make or allow repairs and modifications of the premises under certain conditions. (See id., Ex. 23 at 5, 7.) The Lease specifically stated that the Landlord would install, repair, or replace locks if needed and upon written request.[24] (Id.) The availability of a process for requesting modifications could also be found on Balfour Beatty's website. (See Campbell Dep. at 76-68; Hignite Dep. at 167-68, 173-74; Pl.'s Ex. 4.)

---

[24] "[W]here a representation is controverted by the express terms of a contract, a plaintiff will be unable, *as a matter of law,* to establish that his reliance is justifiable." Rayle Tech, Inc. v. DeKalb Swine Breeders, Inc., 133 F.3d 1405, 1410 (11th Cir. 1998) (applying Georgia law). Here, Ms. Campbell's representation that the modification of the locks and fence was against Balfour Beatty's policy is controverted by the express terms of the lease. Usually, this would be dispositive of the justifiable reliance inquiry. In this case, however, Plaintiff did not actually sign the lease. Mr. Sackman signed the lease and Plaintiff was merely listed as an occupant. (L. Sackman Dep., Ex. 23 at 5, 9.) Under these facts, the Court concludes that the principle articulated in Rayle is not dispositive. Nevertheless, the fact that Plaintiff had access to the lease is still relevant to the justifiable reliance inquiry because it gave her readily available means to determine the veracity of Ms. Campbell's statements.

Yet, Plaintiff did not review the Lease or Balfour Beatty's website to determine whether the modifications proposed were permissible or truly against policy. Plaintiff made no attempt to call Balfour Beatty, to submit any of the available request forms, or make any written request at all. In fact, when a Balfour Beatty employee made a "warm call" to check-in on the Sackmans and ask how everything was going just a few days after the move-in, Plaintiff stated that (1) everything was going well, (2) the service requests made during the move-in had been completed, (3) she had received a service request phone number and log-in information for online requests, and (4) there was no hot water. (L. Sackman Dep. at 68-74, & Ex. 29.) There is no indication that Plaintiff mentioned the fence or lock requests at that time. Plaintiff was also reminded to submit a Property Condition Report. (Id.) Mr. Sackman eventually submitted the report and requested that Balfour Beatty fix minor problems with carpeting and a medicine cabinet. (Id. at 72, 75-75, & Exs. 26, 31.) The report failed to mention any problems with the fence and locks.

In short, Plaintiff took no action to determine the veracity of Ms. Campbell's statements and did nothing to follow up on her requests. Even after Hannah climbed over the fence and the Sackmans became aware of the lake in mid-April, Plaintiff took no further action to renew her request with Balfour Beatty to modify the fence and locks - despite her knowledge of the special danger that the lake posed to Hannah. Similarly, no action was taken to

contact Balfour Beatty after Plaintiff became aware of Hannah's ability to manipulate the locks, aside from warning her to not open the doors.

"By [her] inaction, [Plaintiff] failed to exercise due diligence as a matter of law." Lehman v. Keller, 297 Ga. App. 371, 373 (2009). Plaintiff's "'blind reliance' on [Ms. Campbell's] representation regarding a matter which could have been easily verified demonstrates a lack of due diligence fatal to the fraud claim." Reeves v. Edge, 225 Ga. App. 615, 619 (1997); see also Fowler, 223 Ga. App. at 804 (finding no justifiable reliance as a matter of law where truthfulness of the defendant's statement "could have been discovered through the exercise of the slightest degree of diligence"). Balfour Beatty is entitled to summary judgment on Plaintiff's fraud claim.

### D. Negligent Misrepresentation

"[J]ustifiable reliance is also an essential element of a claim asserting negligent misrepresentation." Buggay, 220 Ga. App. at 451. "To establish reasonable reliance under Georgia law as to either fraud or negligent misrepresentation, a plaintiff must show that [she] exercised due diligence." Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1289 (11th Cir. 2007). Therefore, Plaintiff's failure to exercise due diligence, as described above, also bars her negligent misrepresentation claim as a matter of law.

## E. Punitive Damages

Balfour Beatty argues that Plaintiff may not recover punitive damages in this action for two reasons. Balfour Beatty argues that there can be no award of punitive damages in a wrongful death action. That is true, but incomplete. "[I]t is well settled under Georgia law that '[p]unitive damages are not available in a wrongful death claim.'" Ortiz v. Wiwi, No. 3:11-CV-033, 2012 WL 4468771, at *2 (M.D. Ga. Sept. 26, 2012) (quoting Donson Nursing Facilities v. Dixon, 176 Ga. App. 700, 702 (1985)). However, punitive damages may be awarded to the administrator of the estate in connection with the injuries, pain and suffering of the deceased, as part of a pre-death tort claim of the decedent. Donson Nursing, 176 Ga. App. at 701; Velez, 219 Ga. App. at 688. Here, Plaintiff seeks punitive damages as the administrator of Hannah's estate.[25] (Am. Compl. at 18-19.) Thus, punitive damages are recoverable in this action, but only if there is a legal basis to sustain them. See Donson Nursing, 176 Ga. App. at 701. The Court now turns to that question.

Balfour Beatty also argues that Plaintiff has failed to present a sufficient factual basis for a punitive award under Georgia law. The Court agrees. In Georgia, "[p]unitive damages

---

[25] In its reply brief, Balfour Beatty argues that Plaintiff offers no evidence of Hannah's pain and suffering. (Doc. no. 34 at 12.) However, the record indicates that Hannah drowned in the lake. As the details of her drowning are unknown, a jury might rationally infer that Hannah was conscious at some point during the drowning. This is sufficient to create a jury question on the issue of pain and suffering. See Walker v. Daniels, 200 Ga. App. 150, 157 (1991); Self v. Great Lakes Dredge & Dock Co., 832 F.2d 1540, 1549 (11th Cir. 1987).

may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Mere negligence – even gross negligence – is not enough. Coker v. Culter, 208 Ga. App. 651, 652 (1993); Walker v. Sturbridge Partners, Ltd., 221 Ga. App. 36, 40 (1996), aff'd 267 Ga. 785 (1997).

Plaintiff has not presented "clear and convincing" evidence of the degree of culpability required to sustain an award under section 51-12-5.1(b). There is insufficient evidence to find conscious indifference by Balfour Beatty. Although Balfour Beatty was aware of Hannah's autism, flight risk, and requests to modify the fence and locks, Balfour Beatty knew that Hannah was supervised to some degree by Plaintiff and Mr. Sackman. Further, Balfour Beatty was never informed that Hannah was drawn to water or that she had learned to operate the dead-bolt locks. Therefore, Balfour Beatty was unaware of the particular danger that the lake presented to her. Under these circumstances, Balfour Beatty's failure to repair the fence or locks does not rise to "that entire want of care" from which one could presume conscious indifference to the consequences of inaction. For the same reasons, there is no evidence of willful or malicious conduct.[26] And the Court has

---

[26] Although the Court earlier found sufficient evidence of intentional interference with *Plaintiff's Fair Housing Rights* under 42 U.S.C. § 3617,

44

already determined that there is no fraud in this case as a matter of law.  In short, Plaintiff has not presented a sufficient factual basis for a punitive award under § 51-12-5.1(b) and references no other authority for punitive damages.

Although there is no basis for punitive damages under Plaintiff's Georgia law claims, Balfour Beatty overlooks Plaintiff's federal FHA claims.  According to 42 U.S.C. § 3613(c)(1), the "court may award to the plaintiff actual and punitive damages" if a discriminatory housing practice has occurred.  Neither party has presented any argument regarding the availability of punitive damages under the FHA.  Thus, the Court declines to rule, at least at this time, that punitive damages are completely foreclosed in this action (as contended by Balfour Beatty).

In sum, Plaintiff may not recover punitive damages under Georgia law, and the Court declines to rule on the availability of punitive damages under FHA at this time.

## IV. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Federal Enclave Defense – Third and Sixth Defenses

Plaintiff moves for partial summary judgment as to Balfour Beatty's third and sixth defenses, which are stated in the Answer to the Amended Complaint as follows:

---

that is an entirely different inquiry.  Here, the question is whether – by failing to repair the locks and fence – Balfour Beatty willfully or maliciously intended to cause *the personal injury* (death) that befell Hannah.

> Third Defense: There can be no liability under Georgia
> state law because all events alleged in the amended
> complaint took place at Fort Gordon, a federal enclave.
>
> . . . .
>
> Sixth Defense: Plaintiff's claims are barred in whole or
> in part by the fact of Georgia having surrendered
> sovereignty over Fort Gordon military base, a federal
> enclave, in or around 1917, and having confirmed
> exclusive federal jurisdiction by statute.

(Am. Compl. at 2.) It is undisputed that (1) the events giving

rise to this action took place on Fort Gordon, (2) Georgia ceded

Fort Gordon to the federal government in 1917, and (3) Fort Gordon

is a federal enclave. Plaintiff argues that these defenses fail as

a matter of law because a federal statute incorporates state

wrongful death and personal injury law into federal law applicable

to federal enclaves. Defendant, on the other hand, contends that

Plaintiff's state law claims did not exist as of the date of

cession, 1917, and are therefore barred. The Court agrees with

Plaintiff.

"A federal enclave is created when a state cedes jurisdiction

over land within its borders to the federal government and Congress

accepts that cession." Allison v. Boeing Laser Technical Servs.,

689 F.3d 1234, 1235 (10th Cir. 2012). This includes federal

military bases. Id. Under a body of constitutional law applicable

to federal enclaves, "[i]t is well-established that after a state

has transferred authority over a tract of land creating a federal

enclave, the state may no longer impose new state laws on these

lands. But state laws enacted before the cession continue to apply

unless Congress specifically overrides them." Id. Supreme Court

precedent "makes it clear that the law on a federal enclave is the state law that governed the land at the time the federal government established the enclave, not state law enacted thereafter—unless that law was expressly adopted by the enclave's new sovereign, the federal government." Id. "Congress can legislate on behalf of the enclave *and may provide for the application of state laws enacted after the creation of the enclave*." Id. at 1237 (emphasis added) (citing United States v. Sharpnack, 355 U.S. 286, 294-95 (1958)).

Congress has decided to integrate state law governing wrongful death and personal injury actions into federal law applicable on federal enclaves.

> In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

16 U.S.C. § 457. This statute "envisions the application of the current substantive law of the surrounding state in actions for death or personal injury occurring within a federal enclave." Vasina v. Grumman Corp., 644 F.2d 112, 118 (2d Cir. 1981); see also Voelkel v. Gen. Motors Corp., 846 F. Supp. 1468, 1473 (D. Kan. 1994) ("The second sentence of § 457 makes current state law applicable to personal injury actions [arising on federal enclaves], while the first sentence accomplishes the same for

wrongful death actions."). In regards to such actions, the wrongful death and personal injury law of the federal enclave is not "frozen as of the date of cession;" rather, it is "identical to that of the surrounding state, whatever that law might be and however it might change over time." Vasina, 644 F.2d at 117; accord Adams v. Alliant Techsystems, Inc., 201 F. Supp. 2d 700, 706 (W.D. Va. 2002) ("§ 457 adopts state laws on a *continuing* basis for wrongful death and personal injury actions." (emphasis in original)).

This is a wrongful death and personal injury action arising on a federal enclave. Georgia law applicable to Plaintiff's remaining state law claims, for wrongful death and negligence, is incorporated into federal law and will govern the resolution of those claims.[27]

Balfour Beatty also contends, without providing any authority on point, that the damages asserted by Plaintiff are not adopted by § 457. In particular, Balfour Beatty contends that punitive damages and pain and suffering "are not necessarily" injuries adopted by § 457 or existing prior to 1917. The Court previously determined that Plaintiff may not recover punitive damages under Georgia tort law. Thus, the Court need not decide if Georgia law on punitive awards is adopted by § 457. As to damages for pain and

---

[27] As an aside, the Court notes that negligence - and specifically the landlord's duty to make repairs - has existed in Georgia since 1865, prior to the cession of Fort Gordon. See Thompson v. Crownover, 259 Ga. 126, 127 (1989) (providing a historical overview of landlord duties in Georgia).

suffering, those damages appear to fall squarely within the personal injury law of Georgia adopted by § 457. Balfour Beatty has not provided any authority to the contrary.

Balfour Beatty also argues that the third defense – that there is "no liability under Georgia state law" – is correct because § 457 merely adopts Georgia law as federal law. This argument is technically correct. See Mater v. Holley, 200 F.2d 123, 124 (5th Cir. 1952) (holding that state law applicable within federal enclaves is federal law for purpose of determining whether there is federal question jurisdiction under 28 U.S.C. § 1331). As Balfour Beatty is technically correct that there is no liability arising under Georgia law, the Court has determined that Plaintiff is not entitled to summary judgment as to the third defense. However, this determination in no way impedes Plaintiff from recovering under Georgia law as adopted by § 457. Balfour Beatty's argument is purely pedantic and has no practical effect on the applicable law. For that reason, Plaintiff's claims are not "barred in whole or in part" by the federal enclave doctrine, and the Court concludes that Plaintiff is entitled to summary judgment as to the sixth defense.[28]

### B. Contractual Defense – Fifth Defense

Plaintiff also moves for partial summary judgment as to Balfour Beatty's fifth defense, which states: "Plaintiff's claims are barred by the terms of the [Lease] signed by John Sackman on

---

[28] The Court will continue to refer to Plaintiff's "Georgia" or "state law" claims for ease of reference, even though they are actually federal claims. The parties may feel free to do the same.

March 30, 2012." (Am. Compl. at 2.) Presumably, the fifth defense is predicated on the Lease's exculpatory clause, disclaimer, and separate clauses agreeing that the house and existing locks were safe and acceptable. (See L. Sackman Dep., Ex. 23 at 5, 7-8.)

The parties present a multitude of arguments concerning this defense. (See Doc. nos. 21 at 5-6; 27 at 7-10; 36 at 3-5.) Neither Plaintiff nor Hannah signed the Lease. Plaintiff primarily argues that Mr. Sackman had no authority to bind Hannah, as he was not her biological parent, never adopted her, and was never appointed as her guardian; Plaintiff and Jeffrey Ross still shared custody over Hannah. (J. Sackman Dep. at 49.) Balfour Beatty's primary response is that Mr. Sackman could bind Hannah because he was acting *in loco parentis*. Neither party presents any authority that directly addresses the ability of a person to contractually bind a child when acting *in loco parentis*. The Court, however, need not rule on that issue and subsidiary issues raised because Plaintiff points out an alternative and independent ground for granting her motion.

As Plaintiff notes, Balfour Beatty is not even a party to the Lease. (Doc. no. 36 at 3 n.3.) The only parties to the Lease are Mr. Sackman and Fort Gordon Housing, LLC. (L. Sackman Dep., Ex. 23 at 4.) Balfour Beatty has provided no explanation as to why it is entitled to rely on rights given to Fort Gordon Housing, LLC in the Lease.[29] For example, Mr. Sackman agreed *with Fort Gordon Housing,*

---

[29] Specifically, Balfour Beatty has not argued that it was assigned any of the rights or that it is a third-party beneficiary under the Lease. Nor

*LLC* that all existing locks were safe and acceptable and that *Fort Gordon Housing, LLC* shall not be liable to him or his family members for damages, injuries, or losses caused by defects, disrepair, and other causes. (L. Sackman Dep., Ex. 23 at 5, 7-8.) Balfour Beatty is a separate entity and a non-party to the Lease. Thus, it appears to have no rights under the Lease. Without any contrary argument provided by Balfour Beatty, the Court concludes that Plaintiff is entitled to summary judgment on the fifth defense. Consequently, the Court need not rule on the other issues presented in connection with the fifth defense.

## V. MOTION TO EXCLUDE

Balfour Beatty moves to exclude the testimony of Plaintiff's expert, Mark E. Williams. (Doc. no. 18.) Below, the Court presents the controlling standard and addresses issues presented.

### A. Standard for Expert Testimony

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods of the facts of the case.

---

has it attempted to argue that its ten percent interest in Fort Gordon Housing, LLC entitles it to the rights in the Lease.

"As the Supreme Court recognized in <u>Daubert v. Merrell Dow Pharms.,</u> <u>Inc.</u>, [509 U.S. 579 (1993)], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK</u> <u>Ltd.</u>, 326 F.3d 1333, 1340 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. <u>Quiet Tech.</u>, 326 F.3d at 1340. Specifically, the court must consider whether:

> (1) The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> at 1340-41.

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. <u>Trilink Saw</u> <u>Chain, LLC v. Blount, Inc.</u>, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). A witness's qualifications must correspond to the subject matter of his proffered testimony. <u>See Jones v. Lincoln Elec. Co.</u>, 188 F.3d 709, 723 (7th Cir. 1999).

Second, the testifying expert's opinions must be reliable.  In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  509 U.S. at 592-93.  There are four factors that courts should consider: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community.  Id. at 593-94.  "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."  United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004).  Thus, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known."  Daubert, 509 U.S. at 590.  In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  Fed.

R. Evid. 702, advisory committee's notes (2000 amendment). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, neither an expert's qualifications and experience alone nor his unexplained assurance that his or her opinions rely on accepted principles is sufficient. McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1244 (11th Cir. 2005); Frazier, 387 F.3d at 1261. Moreover, when analyzing a witness's reliability, courts must be careful to focus on the expert's principles and methodology rather than the scientific conclusions that they generate. Daubert, 509 U.S. at 595.

Third, expert testimony must assist the trier of fact to decide a fact in issue. Thus, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Frazier, 387 F.3d at 1262; Daubert, 509 U.S. at 591. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63.

### B. Application

Mr. Williams is Plaintiff's expert as to both standard of care and causation. He opined that Plaintiff's rental house had

"inadequate locking devices," and that given the house's "close proximity . . . to Soil Erosion Lake," it was "reasonably foreseeable to Balfour Beatty that Hannah Ross would be exposed to the water hazard that caused her fatal drowning." (Doc. no. 18, Ex. 1 "Expert Report" at 11.) Furthermore, Mr. Williams opined that Balfour Beatty should have realized Hannah was a flight risk and therefore should not have assigned the Sackmans to a house in close proximity to the lake. (Id. at 12, 14.) He also asserted that Balfour Beatty had a duty to inspect the home and surrounding area, to warn the Sackmans of the lake's proximity to their home, and to install or allow the Sackman's to install at their own expense locks on the home's exit doors which were out of Hannah's reach. (Id. at 16-17, 19, 21-22.) According to Mr. Williams, these actions and inactions violated the FHA and breached the duty of care Balfour Beatty owed to the Sackmans, which resulted in the dangerous conditions that caused or contributed to Hannah's fatal drowning. (Id. at 18-22.) Mr. Williams also opined that these actions and inactions demonstrate conscious disregard for the safety of Hannah Ross. (Id. at 22.)

Balfour Beatty argues that Mr. Williams's testimony should be excluded because: (1) Mr. Williams is not qualified to render opinions regarding any alleged non-compliance with the FHA; (2) his opinions are unreliable because they are not the product of reliable principles and methods; and (3) his opinions present

arguments within the ken of the average person and amount to "naked advocacy." (Doc. no. 18 at 2, 11, 15.)

### 1. *Mr. Williams's Qualifications*

Balfour Beatty contends that Mr. Williams is not qualified to opine on whether Balfour Beatty failed to comply with the FHA because Mr. Williams has failed to explain any previous experience with reasonable accommodations issues under the FHA. (Id. at 5.) Plaintiff, on the other hand, points out that Mr. Williams has previously testified as an expert architect on multiple occasions and has experience and training in code compliance. (Doc. no. 28 at 8-9.) Furthermore, Mr. Williams possesses over fourteen years of experience as a residential property manager. (Id.)

The qualification standard for expert testimony is "not stringent," and "so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Banta Props., Inc. v. Arch Specialty Ins. Co., No. 20-61485-CIV, 2011 WL 7118542, at *2 (S.D. Fla. Dec. 23, 2011). Here, the Court will assume, but not decide, that Mr. Williams is minimally qualified to discuss matters relating to compliance with the FHA.

### 2. *Reliability of Mr. Williams's Testimony*

Balfour Beatty also contends that Mr. Williams's testimony is not reliable. Specifically, Balfour Beatty claims that Mr. Williams did not provide any discernible methodology for his conclusions that Balfour Beatty breached the standard of care applicable to

property management companies, and that its actions and inactions resulted in the dangerous conditions which caused or contributed to Hannah's fatal drowning. (Doc. no. 18 at 11.) In response, Plaintiff argues that Mr. Williams's testimony on causation and reasonable care is reliable because of Mr. Williams's expertise and experience in architecture, his experience as a property manager, and his research. (Doc. no. 28 at 11, 14.)

As noted previously, Mr. Williams is an expert architect with experience in property management. His experience as an architect spans over thirty years and includes work conducting code research and planning and designing the construction of facilities for "at-risk" populations. (Expert Report at 31-39.) His experience as a property manager includes the management of a multi-family residential property, an apartment building, and multiple single family homes. (Id.) Together, these experiences may qualify Mr. Williams to opine regarding whether Balfour Beatty met its standard of care, but when a witness relies "solely or primarily on experience, then the witness must *explain* how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." See Frazier, 387 F.3d at 1261 (emphasis added); see also Fed. R. Civ. P. 26(a)(2)(B) (expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them").

Mr. Williams has not provided any such explanation, basis, or reason for his opinions. Nor has Mr. Williams referenced any specific experiences upon which he relied in reaching his conclusions. To find Mr. Williams's opinion testimony reliable based on his experience alone would be "tantamount to disregarding entirely the reliability prong of the Daubert analysis." Dukes v. Georgia, 428 F. Supp. 2d 1298, 1315 (N.D. Ga. 2006).

Plaintiff also contends that Mr. Williams's testimony is reliable because it is based on "sufficient facts and data." (Doc. no. 28 at 12). Mr. Williams reviewed depositions, agreements between Balfour Beatty and Plaintiff, guidebooks, handbooks written by Balfour Beatty, and documents pertaining to 135 Cypress Circle, among other materials. (Expert Report at 23-30.) Additionally, Mr. Williams reviewed publications related to the FHA, autism spectrum disorders, environmental safety precautions and accommodations for individuals with autism, and lethal outcomes in autism spectrum disorders. (Expert Report at 8-11, 15-16, 18-21.)

Despite his research and purported expertise in the application of industry standards, local ordinances, building codes, fire codes, and federal laws, Mr. Williams fails to explain how any industry standards, code, or other authority supports his opinion. (Williams Dep. at 14-16.) Of the works cited, none address the application of the FHA or Georgia law to the housing of families with autistic children, and none appear to be peer-reviewed. Mr. Williams does not discuss the applicability of the

publications he cites to the case at hand, his experience with these publications, or the extent to which property management companies follow the guidelines included in the publications. Without explanation from Mr. Williams addressing these factors, the Court cannot reasonably rely on these publications and their guidelines as setting forth industry standards or industry practice that Balfour Beatty had to, and failed to, follow.

In the absence of testimony explaining the relevancy and applicability of his expertise, experience, and research to the case at hand, the Court concludes that Mr. Williams has provided no objective, expert methodology linking the facts to his opinions. To find Mr. Williams's methodology reliable as _Daubert_ requires, the Court would need to "take the expert's word for it" and rely on his _ipse dixit_ opinion. However, "[r]eliance on naked assurances of the purported expert is exactly what the Eleventh Circuit in Cook and McClain warned against." _Dukes_, 428 F. Supp. 2d at 1315. Accordingly, the Court finds that Mr. Williams's testimony does not satisfy the reliability prong of the _Daubert_ analysis.

### 3. *Relevance*

Further, expert testimony is not admissible unless it actually _assists_ the trier of fact, _i.e._, "it concerns matters that are beyond the understanding of the average lay person." _Frazier_, 387 F.3d at 1262. Much of Mr. Williams's testimony involves matters which are within the understanding of the average layperson. For example, he opines that: Balfour Beatty should have known that

Hannah was a flight risk; Balfour Beatty should have put the Sackmans in a house further from the lake; extra locks or different locks would have prevented Hannah's escape; Balfour Beatty should have warned the Sackmans about the lake; and Hannah's drowning was reasonably foreseeable. (See Expert Report at 10-11.) These are arguments within the ken of the average person, which could just as easily be made by Plaintiff's counsel in closing arguments. Frazier, 387 F.3d at 1262-63. If an expert can offer nothing more than his "stamp of approval" on the plaintiff's case, his testimony "does nothing to advance a material aspect" of their claims, and therefore lacks the indicia of relevance required by Rule 702 and Daubert. Dukes, 428 F. Supp. 2d at 1315.

In addition, expert testimony couched in terms of legal conclusions is not helpful to the jury and may result in jury confusion. See Allison, 184 F.3d at 1312; Torres v. Cnty. of Oakland, 758 F.2d 147, 150 (6th Cir. 1985). In his report, Mr. Williams presents legal arguments in the guise of expert opinions about the scope of Balfour Beatty's legal duties under common law and the FHA.[30] (See Expert Report at 15-16, 18-21.) When providing testimony, it is not for an expert to "communicate a legal standard - explicit or implicit - to the jury." Berry v. City of Detroit, 25 F.3d 1342, 1353-54 (6th Cir. 1994); see also Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness .

---

[30] Illustrative of this problem is Mr. Williams's attempt to establish the appropriate standard of care by citing sources such as "Every Landlord's Legal Guide." (Expert Report at 15.) The Court prefers to rely on applicable statutes, caselaw, and pattern instructions.

. . may not testify to the legal implication of conduct; the court must be the jury's only source of law."). Although Mr. Williams may be qualified as an expert, "he is not qualified to compete with the judge in the function of instructing the jury." Berry, 25 F.3d at 1354. Because Mr. Williams's testimony encroaches upon the Court's domain over jury instructions and possesses the undeniable propensity to distract and wrongly influence the jury, the Court finds Mr. Williams's testimony inadmissible.

In summary, the Court finds that Mr. Williams's opinions regarding causation and standard of care are not sufficiently reliable and not sufficiently helpful to the trier of fact. Accordingly, Mr. Williams's testimony does not meet the Rule 702 standard, and Balfour Beatty's motion to exclude is **GRANTED**.


## VI. CONCLUSION

Consistent with reasons stated above, Balfour Beatty's motion for summary judgment (doc. no. 16) is **GRANTED IN PART AND DENIED IN PART**. Balfour Beatty is entitled to summary judgment on Plaintiff's claims for reasonable accommodation under the FHA, disability discrimination under the Rehabilitation Act, fraud, negligent misrepresentation, and punitive damages under Georgia law. Plaintiff's claims for reasonable modification and intentional interference under the FHA and negligence under state law shall proceed to trial. Plaintiff's motion for partial summary judgment (doc. no. 20) is **GRANTED IN PART AND DENIED IN PART**.

Plaintiff is entitled to summary judgment on Balfour Beatty's fifth and sixth defenses, but not the third defense. Balfour Beatty's motion to exclude (doc. no. 18) is **GRANTED**, and Plaintiff's expert witness is excluded. This case shall proceed to trial in due course.

**ORDER ENTERED** at Augusta, Georgia, this _8th_ day of September, 2014.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA